# IN THE SUPREME COURT OF IOWA

No. 20–1266

Submitted January 20, 2021—Filed April 2, 2021

**IN THE INTEREST OF A.B., A.C.,** and **A.C.,**
Minor Children,

**T.D.,** Mother, and **S.W.,** Father,

Appellants.

---

Appeal from the Iowa District Court for Polk County, Susan Cox, District Associate Judge.

A mother of three children appeals termination of her parental rights and the father of one of the children appeals termination of his parental rights. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Oxley, J., delivered the opinion of the court in which Christensen, C.J., and Appel, Waterman, and Mansfield, JJ., joined. McDermott, J., filed an opinion concurring in part and dissenting in part in which McDonald, J., joined.

Nicholas A. Bailey of Bailey Law Firm, P.L.L.C., Altoona, for appellant mother.

Karen A. Taylor of Taylor Law Offices, P.C., Des Moines, for appellant father of A.C.

Thomas J. Miller, Attorney General, Ellen Ramsey-Kacena, Assistant Attorney General, and Kevin Brownell, Assistant County Attorney, for appellee.

Kimberly A. Graham of Graham Law Collaborative, Indianola, attorney and guardian ad litem for minor children.

**OXLEY, Justice.**

This appeal involves the termination of parental rights of a mother to her three children and the termination of parental rights of the father of one of the children. Mom timely appealed. Dad of one of the children filed a timely notice of appeal but filed his petition on appeal two days late. He asks us to grant him a delayed appeal and excuse the untimeliness of his petition. As discussed below, we conclude we should recognize delayed appeals in termination-of-parental-rights cases in certain limited circumstances and grant the father's application for delayed appeal. We therefore consider whether the termination of parental rights was proper as to both Mom and Dad.

At the outset, we note that although the guardian ad litem (GAL) originally supported termination of parental rights, following the termination hearing she changed her recommendation. On appeal, she urges us to carefully scrutinize the record of this case and reverse the judgment of the juvenile court. Upon our de novo review of the record, we reverse termination as to Mom but not as to Dad.

## I. Factual Background and Proceedings.

This case involves three children, all of whom have different biological fathers and the same biological mother. We refer to the mother as "Mom" throughout the case. From oldest to youngest, the children are A.B., born in December 2012; A.C.1, born in April 2017; and A.C.2, born in November 2018. A.B.'s father had minimal involvement in the case and did not appeal. A.C.2's father has also been minimally involved and also did not appeal. He is an important figure in the background of the case since before A.C.2 was born, and since he has the same initials as two of the children, we will refer to him by his first name, Akoya. Dad is the father of A.C.1, has been involved in the case, and appealed termination

of his rights. We will refer to him as "Dad." Notably, Mom and Dad also share another daughter, A.W., who was born during the pendency of the present proceedings and is the subject of other proceedings not here involved.

**A. Origins of DHS Involvement.** Mom was brought to the attention of the department of human services (DHS) on September 13, 2018. At the time, Mom was seven months pregnant with A.C.2, Akoya's child. Around 12:30 a.m., Mom parked at a Quik Trip and walked to Budget Inn, where she "banged" on the door to Akoya and his then-girlfriend's hotel room. The girlfriend called the police because Mom was violating a no-contact order the girlfriend had against Mom. Mom explained her presence as an attempt to get money from Akoya and admitted one-year-old A.C.1 was in her car nearby.

The police discovered A.C.1 alone in the car and removed her from her mother's care. Based on the incident, the police arrested Mom and charged her with violation of a no-contact order, driving while barred, and neglect of a dependent person. They contacted DHS personnel, who took A.C.1 to a nearby hospital. Medical personnel noted A.C.1 was unwashed, her clothes were dirty, and her diaper was filled with urine. Mom was taken to jail and remained there until November 15. The court entered a no-contact order between Mom and A.C.1, which Mom did not contest.

DHS investigated the case and discovered A.B., A.C.1's older sibling, was already staying at the maternal grandmother's house. DHS placed A.C.1 and A.B. in the maternal grandmother's custody and filed a child in need of assistance (CINA) petition for each child. DHS issued a founded report of abuse against Mom based on failure to supervise, and both children were adjudicated CINA.

Mom pled guilty to child endangerment, acknowledging she had placed A.C.1 in great danger. The court dismissed the no-contact order between A.C.1 and Mom and gave Mom a suspended sentence and probation. While in jail, Mom was diagnosed with depression. She also acknowledged her relationship with Akoya was "very unhealthy." Less than a month after Mom's release from jail, A.C.2 was born. DHS removed A.C.2 from Mom's care and placed him with his maternal grandmother, who had custody of the older two children.

On December 24, Mom's brother got into a physical altercation with their sister at the maternal grandmother's house that ended only when their sister picked up a knife. All three of Mom's children were in the home at the time of the altercation, and at least A.B. witnessed the violence. As a result, DHS removed the children from the maternal grandmother's care and placed the children into shelter care. A.C.2 was adjudicated CINA on January 8, 2019. Around the same time, Mom moved into a domestic violence shelter. The State placed A.C.2 with Mom.

**B. History Following Removal from the Maternal Grandmother.** DHS began supervised visitation for Mom with the children in January 2019. At the request of DHS, Mom also began therapy at Children and Families of Iowa. When visitation first commenced, A.B. was resistant. He complained that he did not want to see his mother and would physically act out. However, each time A.B. acted out, workers noted Mom handled his behavior well by giving him space and winning him over so that by the end of the visit he did not want to leave Mom.

In February, DHS approved semisupervised visits and overnight visits between Mom and A.B. and A.C.1 at the shelter. Case notes from the time indicate concerns over Mom's homelessness, her time in jail, her allowing unsafe people to be around her children, and her mental health.

Yet they also discussed her consistent visits with the children, during which she interacted appropriately and engaged the children in age-appropriate activities. On February 19, the children were returned to Mom at the shelter.

Mom got her own apartment in early April, and DHS removed the requirement that she reside at the shelter to retain custody. However, Mom got in two altercations with Akoya's girlfriend, one on March 22 and the second on April 29, after which she was again arrested. DHS petitioned to remove the children from her care on May 1.

**C. Placement of the Children in Foster Care.** A.B. was placed with his paternal grandmother while A.C.1 and A.C.2 were placed in separate foster care placements, one in Grimes and the other in Ankeny. This meant there was a significant distance between the placements.

Mom started dating Dad again in March, and he attended some visits with Mom. Notes from visits during the May to June time period document positive family interactions, including strong bonds between Mom and her children. A.B.'s resistance to visits did not continue beyond the first couple of months.

At the beginning of its involvement, DHS recommended Mom engage in counseling services to address her mental health as well as her relationship and domestic violence concerns. Mom began sessions with a mental health counselor in January 2019 and consistently and substantively engaged with her counselor throughout the case. In an accountability letter Mom completed with her therapist in July 2019, she acknowledged her relationship with Akoya was not healthy. She also worked with her therapist on maintaining healthy relationships when she began her relationship with Dad.

Mom contends DHS ceased making reasonable efforts toward reunification during the summer and fall of 2019. She compiled a list of missed visits starting in July. For the most part, Mom's calendar aligns with DHS's reports, though there is some disagreement on specific dates. However, discrepancies become more significant in September and October. These included cancelled visitation and additional services DHS failed to provide.

On August 16, DHS requested drug tests from both Dad and Mom. Dad tested positive for marijuana, amphetamines, and cocaine. Mom did not complete the test until August 19, allegedly because she could not get a ride. Mom tested positive only for marijuana and at a low level near the test's cutoff value. Based on this drug test and an assumption Mom would have tested positive for cocaine on the 16th, DHS returned to fully supervised visits starting August 19.

Following her positive drug screen in August 2019, DHS requested Mom complete a substance abuse evaluation and participate in substance abuse counseling. Mom completed the evaluation and was initially screened to receive early intervention substance abuse services. She regularly participated in substance abuse counseling, including frequent random and observed drug screens. After Mom tested positive for THC in October, her counselor modified her treatment level to extended outpatient services in November. Mom submitted consistently negative drug screens thereafter, with one exception in February 2020, when she tested positive for cocaine. She engaged in services with her substance abuse counselor throughout the case.

In November, Mom moved for a reasonable efforts hearing. She cited frequently cancelled visits, lack of sibling visits and related transportation

issues, and failure to move forward with less restrictive visits as reasons DHS was not making reasonable efforts.

**D. December Incident.** On December 3, 2019, Dad and Mom got into an altercation that led to each being arrested. The altercation began because Mom had decided to end her relationship with Dad and asked him to leave her apartment. He refused at first, and when he did agree to leave, he insisted on taking an Xbox from the apartment. Mom told him he could not take the Xbox because A.B. liked playing with it. This escalated into physical fighting, apparently instigated by Dad. The fight ended when Mom grabbed a knife.

Both parties were arrested for domestic abuse assault. Dad had been driving a stolen vehicle, so he was also charged with operating a vehicle without the owner's consent. Dad was able to bond out of jail, but Mom remained there for almost the entirety of December. The court entered a no-contact order between Mom and Dad. Dad entered *Alford*[1] pleas to disorderly conduct and operating a vehicle without the owner's consent.

The charges against Mom were dropped, and she was released from jail on December 28. Despite the no-contact order, she called Dad to pick her up. She also called Dad repeatedly while in jail, later explaining she did so because she was bored and so she could ask Dad about the children. She later admitted she should not have done so.

Mom resumed visits on January 3, 2020. Positive themes regarding her parenting continued through January, February, and March. Nonetheless, DHS moved to terminate Mom's and both fathers' parental rights to the younger two children, A.C.1 and A.C.2, on February 7.

---

[1] *See North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160 (1970).

Mom gave birth to a new daughter, A.W., in April 2020. Dad is also A.W.'s father.

### E. COVID-19.

In March 2020, DHS changed its visitation protocols based on the COVID-19 pandemic. Thereafter, visits were primarily by video calls. These calls were difficult for all parties at times. When A.B. had trouble focusing, Mom arranged to be physically present with him at the home of his paternal grandmother. Mom also struggled at times with the video chatting format, sometimes not fully engaging in the visits and leaving workers to interact with the children. The video chats were shorter than usual visits, but the caseworker explained that "[Mom] sacrificed that time because she could see, for the well-being of her children, asking them to stay on those Zoom visits was not appropriate."

**F. Dad's Involvement.** Dad was confirmed as A.C.1's father in January 2019, and DHS agreed to involve him in the case. During the time the children were living with Mom from January 2019 through April 2019, Dad did not attend any visits with A.C.1. Following the children's removal in May, Dad contacted DHS seeking custody of A.C.1 and began visits with her in mid-May 2019. Thereafter, since Dad and Mom were in a relationship, both attended visits with A.C.1.

Following Dad's August 16 positive drug test, DHS workers requested he get a substance abuse evaluation and begin substance abuse treatment. He did not follow through on this request.

Following the December 2019 domestic assault incident, Dad and the maternal grandmother continued to have visitation with all the children while Mom was in jail. Dad participated in the visits, but the maternal grandmother did most of the parenting. Dad missed a scheduled visit on January 3, 2020, and had sporadic visits through the spring,

purportedly because his work schedule interfered. It does not appear he participated in remote visits following the change to DHS protocols caused by COVID-19.

Dad experienced difficulty finding stable housing throughout this case. Apart from the time he lived with Mom, he lived with family members and moved from place to place. Dad also refused to engage in therapy, despite DHS's requests to complete a mental health evaluation, and it appears Dad never meaningfully engaged in substance abuse treatment.

**G. Reasonable Efforts and Termination of Parental Rights.** DHS moved to terminate parental rights to the younger two children on February 7, 2020. The court consolidated Mom's November 2019 motion for reasonable efforts with a permanency hearing on February 27. Mom filed an amended motion for reasonable efforts prior to that hearing, arguing a handful of new grounds.

At the hearing held on February 27, the parties learned Akoya (A.C.2's father) and his appointed attorney had a conflict. The court then continued the hearing with respect to both A.C.1 and A.C.2. The court decided to proceed on a permanency hearing for just A.B., combined with the reasonable efforts hearing for A.B. alone, over Mom's objection. The trial was bifurcated into a reasonable efforts and permanency hearing for A.B., and a later reasonable efforts and termination proceeding for A.B., A.C.1, and A.C.2. The second hearing did not take place until June 26. The court waited to rule on any of the motions until after the second hearing.

The Court Appointed Special Advocate (CASA) report submitted at the February 2020 hearing is illuminating. The CASA noted A.C.1 was well bonded to her foster family but appeared also bonded to Mom. The CASA also acknowledged the strong bond between A.B. and Mom.

However, she noted that A.B. had taken Mom's arrest hard and that he had been discussing the arrest as a problem A.B. and Mom shared. Yet, "[Mom] recognized that this has been very hard on [A.B.]. Physically he is doing well. . . . However, emotionally and behaviorally he struggles. He has been waiting this whole time to come home."

The CASA had discussed the domestic incident between Dad and Mom with Mom, who acknowledged that she understood the real concern was not her parenting but her relationships. Mom told the CASA she had concluded she should not be in a relationship and should focus on her children. The CASA noted, "[Mom] was tearful and showed genuine remorse as she thought of her children and all that they have been through."

The CASA concluded Mom and Dad still appeared to be together following Mom's release from jail based on a photograph posted January 1, 2020, on Facebook of them kissing. Yet, the CASA also held the "impression that [Mom] is trying to distance herself from [Dad] given that he is at odds with the advice and recommendations of DHS."

In her February 2020 recommendation, the CASA noted that "[t]here is no problem with the bond between [Mom] and her children. [Mom] clearly loves her children and wants to remain involved in their lives." However, the CASA stated, "Unfortunately the relationship drama concerning [Akoya] that started this case in the first place just seems to have continued with [Dad], with no end in sight given that [Mom] is now expecting a second child with [Dad]"

In the CASA report for June 2020, the CASA scaled back many of her prior concerns. She highlighted that Mom had a good bond with the children and that she "loves, cares for, and is concerned about the children. She shows a strong desire to be involved in their lives. She

attends doctor[']s visits. She pumps milk for and breastfeeds the new baby." However, the CASA was insistent in her belief that Mom and Dad had continued a clandestine relationship. The reason she recommended termination was, specifically, "[d]ue to [Mom] and [Dad] still [being] together and choosing not to stop abusing drugs and/or seek treatment," despite the many negative drug screens Mom provided and her lengthy participation in treatment. The report also noted that "[Mom] and [Dad] would benefit from parent skills training to ensure they create a safe home environment," despite the extensive documentation of Mom's participation and excelling in such services.

Ultimately, the court denied Mom's motion for reasonable efforts and terminated the parental rights of all parents in a ruling issued on September 20. Mom timely filed an appeal. Neither A.B.'s father nor Akoya appealed. Dad timely filed a notice of appeal but did not timely file his petition on appeal. The State moved to dismiss Dad's petition.

## II. Delayed Appeals in Termination-of-Parental-Rights Cases.

We start our legal analysis by determining whether we can hear the father's appeal. Dad's attorney filed a timely notice of appeal on October 4, 2020. However, the petition on appeal was not filed until October 21, seventeen days later and beyond the fifteen-day period required by Iowa Rule of Appellate Procedure 6.201(1)(*b*). Dad's attorney candidly admits the late filing was her fault, explaining she was quarantined and working from home because her daughter had tested positive for COVID-19 and she failed to properly calendar the petition's due date on her remote calendar.

Because our rules preclude extensions for the filing period for petitions on appeal, *see* Iowa R. App. P. 6.201(1)(*b*), Dad asks us to recognize delayed appeals for cases involving the termination of parental

rights, similar to those allowed in criminal cases. While Dad's notice of appeal was timely, our rules require the petition on appeal to also be timely filed before the appeal is deemed properly perfected. *See id.* r. 6.102(1)(*b*) ("An appeal in a termination-of-parental-rights . . . case will be dismissed unless a petition on appeal is timely filed . . . ."); *id.* r. 6.201(3) ("If the petition on appeal is not filed . . . within 15 days . . . , the supreme court shall dismiss the appeal, and the clerk shall immediately issue procedendo.").

We have previously recognized "delayed appeals" in criminal cases as an exception to our jurisdictional rules.[2]

> Ordinarily the failure to take a criminal appeal within the specified time limits requires dismissal for lack of jurisdiction. We have, however, granted applications for a delayed direct appeal where a defendant "has made a good faith effort to perfect his appeal and has directed his attorney to proceed therewith but due to a technical irregularity the appeal was either filed late or notice was improperly served."

---

[2]In the dissent's view, failure to comply with rule 6.201(1)(*b*) is mandatory and jurisdictional, which prevents our court from even proceeding. We have never addressed whether the fifteen-day period for filing a *petition on appeal* contained in rule 6.201(1)(*b*) is actually jurisdictional. Query whether that rule, not subject to legislative oversight as is the time period for filing the *notice of appeal* in rule 6.101, is strictly jurisdictional. *See* Iowa Code § 602.4201(3)(*d*) (2020) (requiring only rules of appellate procedure 6.101 through 6.105, 6.601 through 6.603, and 6.907 to proceed through the legislative council rulemaking process contained in Iowa Code section 602.4202); *Root v. Toney*, 841 N.W.2d 83, 90 (Iowa 2013) (recognizing that the notice of appeal deadline contained in rule 6.101 is effectively statutory although it is contained in our rules because "[t]he rulemaking requirements [in Iowa Code section 602.4201(3)] include submission of a proposed rule change to the legislative council, which has the power to delay implementation to allow the general assembly to enact a bill changing the rule [pursuant to Iowa Code section 602.4202]").

Putting that issue aside, the dissent's insistence that we cannot proceed with a case where the appellant fails to comply with our appeal procedures ignores that the criminal cases where we have recognized delayed appeals did so despite clear jurisdictional infirmities. Further, the dissent's legalistic position and reliance on the views of dissenting United States Supreme Court justices about federal court jurisdiction (where our rule would be considered a claims-processing rule rather than a jurisdictional mandate in any event, *see Hamer v. Neighborhood Hous. Servs. of Chi.*, 583 U.S. ___, ___, 138 S. Ct. 13, 21–22 (2017), does not sway our obligation to apply our own law.

14

*State v. Anderson*, 308 N.W.2d 42, 46 (Iowa 1981) (citation omitted) (quoting *Cleesen v. State*, 258 N.W.2d 330, 332 (Iowa 1977)). Having long recognized delayed appeals in criminal cases, we see no principled reason to not also recognize them in termination-of-parental rights cases in the very limited circumstances we describe below.

In the context of criminal cases, we have allowed delayed appeals as a remedial procedure that excuses a party's failure to timely perfect their appeal in the very limited situation "where it appears that state action or other circumstances beyond appellant's control have frustrated an intention to appeal" and denial of the right to appeal implicates the appellant's constitutional rights. *Swanson v. State*, 406 N.W.2d 792, 792–93 (Iowa 1987) (citing *State v. Horsey*, 180 N.W.2d 459, 460 (Iowa 1970), and *Ford v. State*, 258 Iowa 137, 142, 138 N.W.2d 116, 119 (1965), as recognizing availability of delayed appeals but denying application where petitioner for postconviction relief, acting without advice of counsel, argued only that he was "misinformed" about the time for filing a notice of appeal). In *State v. Anderson,* we allowed a delayed appeal where defendant's appointed counsel failed to appeal an underlying judgment until after resolution of a motion for new trial based on newly discovered evidence, which made the appeal untimely as to the underlying judgment. 308 N.W.2d at 46. We reasoned that the rules in effect at the time put the defendant in a difficult spot, concluding that "defendant has made a good faith effort to appeal and at all times clearly intended to appeal." *Id.* In *Horstman v. State,* we allowed a delayed appeal where a criminal defendant's pro se communications expressing his desire to appeal and requesting an appointed attorney were filed with the clerk within the time for filing a notice of appeal but no notice of appeal had been filed. 210 N.W.2d 427, 429 (Iowa 1973).

We made clear in *Swanson v. State* that a delayed appeal is not a matter of discretion but "is limited to those instances where a valid due process argument might be advanced should the right of appeal be denied." 406 N.W.2d at 793. We recognized the same federal constitutional considerations were "potentially applicable in some civil settings." *Id.* at 792 n.1.

Prior to July 1, 2001, appeals from termination orders followed the same procedural rules that applied to all appeals. *See* Iowa Code § 232.133(2) (1999). However, the general assembly amended that section effective July 1, 2001, providing: "[t]he supreme court may prescribe rules to expedite the resolution of appeals from final orders entered pursuant to section 232.117." 2001 Iowa Acts ch. 117, § 1 (codified at Iowa Code § 232.133(2) (2003)). The impetus for the amendment was an effort at the federal level to encourage prompt resolution of termination proceedings and accomplish permanency for children as soon as feasible. *In re C.M.*, 652 N.W.2d 204, 208–09 (Iowa 2002). While family preservation was, and remains, an important goal of child welfare services, the overriding goal is the best interests of the child. Prolonging the period during which social services agencies attempt to either reunify a family or terminate a parent's rights can be detrimental to children, for whom permanency is critical to their best interests. Thus, the focus at the federal level shifted from family reunification to "time-limited family reunification services." *Id.* at 208 (quoting 42 U.S.C. § 629(a)(7) (2000 & Supp. II 2002)). We, as a state, have followed suit. *See In re J.H.*, 952 N.W.2d 157, 170 (Iowa 2020) ("While we recognize the law requires a 'full measure of patience with troubled parents who attempt to remedy a lack of parenting skills,' Iowa has built this patience into the statutory scheme of Iowa Code chapter 232." (quoting *In re Z.P.*, 948 N.W.2d 518, 523 (Iowa 2020) (per curiam))); *see*

*also In re M.D.*, 921 N.W.2d 229, 233 (Iowa 2018) ("The focus of child welfare in this country, and Iowa, is now on permanency, and continuances of court hearings to accommodate parents might offend this goal.").

The general assembly left to us whether to expedite the appeal process, and if so, the specific rules to implement. We took the general assembly's heed and enacted rules specific to appeals from Iowa Code chapter 232 orders. *See* Iowa R. App. P. 6.101(1), 6.102(1), 6.201–.205. Now, instead of a thirty-day period to file a notice of appeal followed by the opportunity for full briefing after the transcript of the proceedings is available, an appeal from a termination order must be filed within fifteen days of the order, a petition on appeal must be filed fifteen days after that, and the response, if any, must follow within another fifteen days. *Id.* r. 6.101(1)(*a*), 6.201(1)(*b*), 6.202(2). Under this expedited process, an appeal is ready for the court within forty-five days of the final order of termination. Previously, such appeals took months to reach an appellate court and would likely still be waiting for the transcript forty-five days after the order of termination. This expedited process makes sense in light of our focus on the best interests of the child, since the parties—and importantly the children—are in a state of limbo while the wheels of justice grind through the appeal process. *See In re A.C.*, 415 N.W.2d 609, 613 (Iowa 1987) ("Neither will childhood await the wanderings of judicial process.").

Nonetheless, we cannot short shrift the importance of the appeal process to a parent whose parental rights have been terminated. The "status of parents' interest in the care, custody, and control of their children . . . [is] 'perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court.' " *Santi v. Santi*, 633 N.W.2d 312, 317 (Iowa 2001) (quoting *Troxel v. Granville*, 530 U.S. 57, 65–

66, 120 S. Ct. 2054, 2060 (2000)). Thus, the termination of parental rights, including the appeal process, clearly implicates protected liberty interests for parents to which due process protections attach. *See In re C.M.*, 652 N.W.2d at 211 (addressing due process and equal protection challenges to appeal process limiting appellant to streamlined petition on appeal rather than full briefing and concluding parent's rights were adequately protected by the expedited procedure); *see also In re M.D.*, 921 N.W.2d at 235–36 (holding due process entitled incarcerated parent to participate in the entire termination proceeding); *In re A.M.H.*, 516 N.W.2d 867, 870 (Iowa 1994) ("It is not disputed that state intervention to terminate the relationship between [a parent] and [the] child must be accomplished by procedures meeting the requisites of the Due Process Clause." (alteration in original) (quoting *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 37, 101 S. Ct. 2153, 2165 (1981) (Blackmun, J., dissenting))). Indeed, some may consider termination of a parent's rights a more significant intrusion than the liberty rights at stake in criminal proceedings. *Cf. In re A.M.H.*, 516 N.W.2d at 870 ("The right of a parent to companionship, care, custody, and management of his or her children has been recognized as 'far more precious . . . than property rights . . . ,' and more significant and priceless than 'liberties which derive merely from shifting economic arrangements.'" (omissions in original) (citations omitted) (first quoting *May v. Anderson*, 345 U.S. 528, 533, 73 S. Ct. 840, 843 (1953), and then quoting *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 1212 (1972))).

One of the important safeguards of a parent's due process rights is the assistance of counsel. *See In re M.D.*, 921 N.W.2d at 239 (Christensen, J., concurring in part and dissenting in part) (recognizing "the importance of the presence of counsel as a safeguard for the parent's due process

rights"). By statute, parents are entitled to appointed counsel in termination proceedings. *See* Iowa Code § 232.113 (2020). But what happens when a parent's counsel fails to perfect the parent's appeal and the appeal is summarily dismissed? Unless a delayed appeal is recognized, that parent has no further recourse; the termination is final.

This brings us back to the expedited appeal process for termination orders. We have upheld the expedited process, including both the fifteen-day period and the use of the streamlined petition instead of a full-blown brief, against equal protection challenges. *See In re L.M.*, 654 N.W.2d 502, 505–06 (Iowa 2002) (rejecting challenge to fifteen-day period for filing petition on appeal); *In re C.M.*, 652 N.W.2d at 211 (rejecting challenge to use of petition on appeal rather than full briefing process). The limited petition on appeal procedure also satisfies a parent's due process rights. *See In re C.M.*, 652 N.W.2d at 211. In short, the expedited appeal process is "narrowly tailored to address the State's compelling interest" in providing permanency. *Id.*

Even though the rules themselves pass constitutional muster, there still may be circumstances for allowing a delayed appeal. As noted, if an attorney fails to timely file the notice of appeal or timely complete the petition on appeal, under our rules the parent lacks any recourse. There is no corollary to the postconviction relief mechanism used in criminal cases for the termination of parental rights. Given the clear liberty interests implicated in termination proceedings, we see no reasoned basis for refusing to allow a delayed appeal similar to what we have long recognized in criminal cases. Indeed, the delayed process may be even more important in this context, where a parent whose rights have been terminated has no mechanism for challenging the termination other than through an appeal.

That said, we believe the delayed appeal standard should be strictly circumscribed. We adopt the prerequisites we have applied in criminal cases and allow a delayed appeal only where the parent clearly intended to appeal and the failure to timely perfect the appeal was outside of the parent's control. We also consider the countervailing interests involved, as there is much more at stake than the parent's rights. Children have an interest in finality so they can move forward with a permanency plan. Thus, even when the delayed appeal prerequisites are met, we caution that an untimely appeal should be allowed to proceed only if the resulting delay is no more than negligible.[3]

Here, the juvenile court's termination order was entered on September 20, Dad timely filed his notice of appeal on October 4, but his petition on appeal was filed two days late on October 21. Dad's intent to appeal is obvious from the timely notice, and his counsel has taken the blame for not properly calendaring the deadline due to required quarantining and working from home after her daughter tested positive for COVID-19.[4] We conclude these facts meet the prerequisites for allowing a delayed appeal. We also note that the two-day delay did not unnecessarily

---

[3]While the dissent believes allowing delayed appeals under any circumstances whatsoever provides "weak medicine with nasty side effects," we note that in calendar year 2020, our clerk's office dismissed only six termination-of-parental rights cases for filing a late notice of appeal and twenty-three for missing the deadline for filing a petition on appeal. The strict limits we place on allowing delayed appeals strikes the proper balance among the significant interests of all parties involved.

[4]That is not to say an attorney's inadvertent failure to properly calendar the deadline for a petition on appeal will entitle her client to a delayed appeal. Such would effectively write our "no extensions" provision out of the rules, which we have no intention of doing. Rather, we recognize the extenuating circumstances in this case involving the heightened quarantining practices required by the coronavirus, particularly in the October 2020 timeframe involved here, during which Iowa experienced some of its highest transmission rates, hospitalizations, and deaths. *See, e.g.*, Ryan J. Foley, *Iowa's COVID-19 Death Rate Among Highest in US, Report Says*, AP News (Oct. 23, 2020), https://apnews.com/article/virus-outbreak-public-health-death-rates-iowa-iowa-city-fa8a42c8c40ab3d36034a851e922c9ad [https://perma.cc/KMA4-MY4E].

prolong the appeal process. We do not downplay the importance of our expedited rules. But just as recognizing delayed appeals in criminal cases did not open any floodgates for untimely appeals, we have no reason to believe recognizing delayed appeals in termination cases will be any different. We simply cannot let the significant rights at stake be outweighed by the negligible delay involved here.

### III. Standard of Review.

We review termination of parental rights de novo. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). We are not bound by the factual findings of the juvenile court, though we give them respectful consideration, particularly regarding credibility determinations. *Id.*

The State must prove termination was proper by clear and convincing evidence. *Id.* "Evidence is considered clear and convincing 'when there are no "serious or substantial doubts as to the correctness [of] conclusions of law drawn from the evidence." ' " *Id.* (alteration in original) (quoting *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010)).

### IV. Analysis.

Mom appeals both the adverse finding on reasonable efforts and the termination of her parental rights to all three children. Dad appeals the termination of his parental rights to A.C.1. Mom and Dad's parental rights to A.C.1 were terminated under Iowa Code section 232.116(1)(*h*), requiring the State to prove:

> (1) The child is three years of age or younger.
>
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
>
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.

(4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

Mom's rights to A.C.2 were terminated pursuant to the same section. Mom's parental rights to A.B. were terminated pursuant to section 232.116(1)(*f*), which varies from subsection (*h*) only in that it applies to children age four or older and requires twelve months out of the parent's custody instead of six months. The only factor either parent contests is subsection (4)—that there is clear and convincing evidence the child could not be returned to the parent's custody at the present time.

"Our review of termination of parental rights under Iowa Code chapter 232 is a three-step analysis." *In re M.W.*, 876 N.W.2d at 219. First, we must determine "whether any ground for termination under section 232.116(1) has been established." *Id.* If so, we next "determine whether the best-interest framework as laid out in section 232.116(2) supports the termination of parental rights." *Id.* at 219–20. If we conclude section 232.116(2) supports termination, "we consider whether any exceptions in section 232.116(3) apply to preclude termination of parental rights." *Id.* at 220.

**A. Termination of Mom's Parental Rights.** The juvenile court terminated Mom's parental rights on the basis that the children could not be returned to her custody at the time of the adjudication. Iowa Code § 232.116(1)(*f*), (*h*). The State had the burden to prove the statutory prerequisites by clear and convincing evidence. Significantly, the GAL and Mom both urge us to carefully scrutinize the record independently of the juvenile court, arguing there exists a lack of record support for the court's findings.

Determining whether the State met its burden requires a look at the reasons DHS advanced for termination. DHS identified two things

preventing return of the children to Mom: sobriety and domestic violence. Before we address those grounds, however, we address the parties' concern that the juvenile court did not fairly consider the record evidence.

1. *Concerns about some of the juvenile court's findings.* Our review of the record raises concerns about some of the juvenile court's findings. Some of those concerns might have been avoided if the juvenile court had drafted its ninety-nine-page ruling more tightly and succinctly.

We first note the court made at least two clearly inaccurate fact findings, which seem to have colored its view. First, in some early orders in this case, the juvenile court states that Mom was part of a previous case with DHS that resulted in a termination of her parental rights to other children. This is incorrect. Second, the juvenile court incorrectly declared Mom to be the subject of a second founded child abuse report on January 28, 2019. As Mom and the GAL explain, the report did not involve Mom. The only founded report against her was the initial September 18, 2018 report that brought the family to DHS's attention.

The court also relied heavily on Mom's criminal history, most of which centered on her relationship with Akoya and occurred prior to the September 2018 incident that brought Mom to DHS's attention. The emphasis on that criminal history fails to recognize that Mom successfully removed Akoya from her life.

Additionally, despite the length of the juvenile court's order, it appears the juvenile court routinely failed to acknowledge positive reports about Mom contained in the record. For example, the juvenile court did not discuss the positive evaluations provided by her substance abuse counselor, focusing only on missed appointments and positive test results.

The juvenile court also did not acknowledge the positive comments from Mom's mental health therapist. The district court's characterization

of the therapist's June 24, 2020 letter discussing Mom's progress reflects the district court's dismissiveness. In the letter, the therapist noted Mom was always respectful, eager to learn, and discussed her emotions openly. After explaining the focus of their sessions, including domestic violence education, healthy relationships, boundaries, and accountability, the therapist noted Mom reported greater understanding of her triggers, impulsivity, and emotional reactions and how to cope with those responses to make healthy decisions. The therapist then noted, "[Mom] reports that she has ended relationships with significant others with whom her relationship was unhealthy. She reports that she is now single." Yet the juvenile court characterized the therapist's letter, in its entirety, as follows:

> On June 24, 2020, the mother's therapist provided an update. She began working with the mother 18 months ago. The mother participated in 36 session[s]. In March, 2020, the therapist offered to meet with the mother through telehealth. The mother declined. At the end of May, the mother finally agreed to resume therapy through telehealth.
>
> The mother told the therapist "she is now single." This statement did not have any other context in the report.

The "other context" in the report was a clear reference to Mom's efforts at creating healthy relationships, a primary concern for DHS's involvement.

Although the juvenile court highlighted the difficulties Mom had with video visits with the children, it did not credit Mom for meeting with A.B. in person or acknowledge the worker's belief that she cut the visits short in the best interests of the children. The juvenile court also concluded Mom lacked insight into what caused this case, contrary to both of her therapists' letters and the CASA report.

In its discussion of Mom's parenting, the juvenile court declared, "DHS noted [Family Safety, Risk, and Permanency (FSRP)]'s parenting concerns for the mother. These included her 'ability to time manage,

needing prompt[ing] to change diapers, and needing some assistance from FSRP to help with the children.' " We find this conclusion significantly at odds with the record evidence. These concerns were only noted in a handful of reports, to which Mom objected as containing inaccuracies. It is also contrary to testimony offered at the July 2020 hearing by the FSRP worker involved in the case since November 2019 that "parenting . . . has never been an issue with this particular mom."

Further, the juvenile court never discussed positive reports about Mom's parenting, despite the vast majority of reports about her parenting being positive. One example is the Safe Care parenting program. The juvenile court's order noted only that Mom completed the program without mentioning the evaluation, which noted she "was prepared for sessions and showed a thorough understanding of the material," was "very engaged . . . and open to learning new skills," and overall "excelled" in the program.

With respect to the specific negative reports relied on by the juvenile court, Mom contended those reports were unreliable, identifying discrepancies between her records of visits and those submitted by the department. The juvenile court rejected her claim, declaring it did "not believe the mother's claim 'visits were often cancelled or rescheduled.' " Our careful review of the record, however, reveals there is some truth to Mom's contention.

DHS workers confirmed there were problems with cancellations and rescheduling. For instance, in its termination report, DHS noted, "There are some discrepancies between what FSRP reports and [Mom] reports. The team discussed visits . . . and adding more time and making up missed visits. *FSRP continues to work on making up time.*" (emphasis added). These are references to visits cancelled by FSRP workers. Similar comments appear in many documents in the record.

Moreover, a careful look at the record reveals a time period from approximately August 2019 until a new caseworker took over in November 2019 when the reports contained inaccuracies.[5]

It is also notable that these particular reports, already suspect, are the only evidence in the record that criticize Mom's parenting. No evidence from either before or after that period notes a need to prompt Mom to change a diaper. No other evidence suggests she spoke harshly to her children. There are enough errors in this group of reports to cast doubt on their content. Yet, the juvenile court relied on those specific reports, emphasizing them above other complimentary reports.

These discrepancies indicate the juvenile court relied on an inaccurate view of the record. We turn to the reasons advanced by DHS for termination to determine whether the evidence supports the juvenile court's ruling.

2. *Sobriety.* The juvenile court and the CASA concluded substance abuse supported termination of Mom's parental rights. However, a finding that Mom has an issue with sobriety affecting her ability to parent is not supported upon examination of the record.

The records reveal the following substance use: Mom's first positive test for marijuana on August 19, 2019, positive tests for THC between October 9 through November 19, a single positive result for cocaine in February 2020, and a single positive result for alcohol in May. It must be

---

[5]A clear example is the report of a team meeting in the chronology of family contacts on September 20, complete with details of the meeting, when all other record evidence indicates the meeting happened on October 15. In another instance, the description of the interaction is clearly a copy-and-paste: October 3 and October 4 contain the exact same narrative, including that Mom had texted requesting to meet at McDonald's because her electricity was out and that Mom forgot diapers, so her friend had to bring them. We do not intend to disparage the worker; her father passed away during this time period, and a few months later, she left the social work profession. We make these observations in an effort to reconcile discrepancies in the record.

noted however, that Mom provided numerous negative tests prior to, between, and after, these finite positive results. The results cannot be considered in a vacuum.

After Mom's positive drug screen for marijuana in August 2019, the workers on her case switched her from semisupervised to fully-supervised visitation in August. Mom denied she had a substance abuse problem but engaged in substance abuse counseling, including providing regular drug screens through her counselor. Substance abuse was never identified as a primary concern as to Mom's ability to safely parent her children.

At trial, Mom explained her August positive test result as exposure to secondhand smoke, which her substance abuse counselor admitted to DHS workers was possible. She explained her October and November positive screens as the result of using vape pens to smoke nicotine that had previously been used with THC and testified she stopped using vape pens altogether after her substance abuse counselor informed her that using the same vape pens would still contain THC. Significantly, she did not test positive for any substances at any of multiple drug tests prior to August 2019 and never tested positive for THC again after the one-month period between October and November.

The juvenile court acknowledged neither Mom's vape pen explanation, including her counselor's apparent acceptance of the explanation, nor the tacit admission contained within it. It also did not, despite drawing conclusions based upon the individual results of Mom's urine screens, acknowledge the complexities involved in evaluating the meaning of the results of positive marijuana urine screens. A full review of the literature is beyond the scope of this case, but we acknowledge for our purposes that each positive result does not necessarily indicate new use. *See* Marilyn A. Huestis, *Cannabis, in Principles of Forensic Toxicology*

336–38 (Barry Levine ed., 4th ed. 2013) [hereinafter Huestis] (discussing the difficulty in determining when use occurred based on a urine screen indicating a positive THC result). We caution that interpreting the meaning of a positive THC result involves many complexities, and that what individual results indicate about use, including when or whether new use has occurred, may not be clear without exploring those complexities, if even then.[6] Courts should consider these complexities before drawing any inferences surrounding individual results. On close examination of the record, it does not appear Mom has an ongoing problem with marijuana abuse. *Cf. In re M.S.*, 889 N.W.2d 675, 682 (Iowa Ct. App. 2016) (en banc) ("It is a mistake to . . . draw an inference of recent and significant use unsupported by medical literature and unsupported by the laboratory actually conducting the test and reporting the results.").

With respect to the positive cocaine test in February 2020, we note that throughout this case, Mom provided one positive cocaine result. She tested consistently enough that additional use would likely have been detected. Moreover, she has cooperated with her substance abuse counselor and has seemingly admitted cocaine use to her. This appears, from the counselor's letter, to be a coping mechanism to deal with trauma. It is notable the positive result occurred just days before the February 2020 hearing. It is also quite telling that DHS allowed Mom to pump breastmilk for A.W. despite the prior positive cocaine test. The juvenile court acknowledged DHS discussed this with Mom and she assured them the milk would be clean. DHS clearly was not concerned about an ongoing issue with cocaine use.

---

[6]In fact, in some circumstances, THC levels can *increase* despite a person not using anew, varying with the hydration level of the individual. Huestis at 337.

To the extent Mom missed appointments with her substance abuse counselor, those absences correlated with the birth of A.W. and the switch to videoconferencing in April and May due to COVID-19. Mom's counselor reported that she had reengaged in regular sessions and was making progress toward her goals. In a June 2020 report, the counselor also noted that Mom was engaging in increasingly healthy coping mechanisms and had begun addressing the connection between trauma and substance abuse. The counselor noted, "Based on sessions with [Mom], she is in the action stage of change for substance use." The counselor concluded Mom had "been an engaged and willing participant in working on these goals during sessions."

We do not make light of the substance abuse that appears in this record. It is troubling that Mom would use cocaine and try to hide it. It is especially troubling that she would use cocaine while she was pregnant. However, it appears Mom has addressed and continues to address this issue. While the record indicates Mom should continue engaging with her substance abuse counselor, her substance abuse does not support terminating her parental rights.

Finally, and crucially, there is no allegation in this record that Mom's substance use interfered with her ability to parent safely. *See In re M.S.,* 889 N.W.2d at 682 (noting termination of parental rights on the basis of substance abuse requires a nexus between the substance use and adjudicatory harm to the child); *cf. In re J.S.,* 846 N.W.2d 36, 42–43 (Iowa 2014) (holding mother's use of methamphetamine, in and of itself, did not mean children were in imminent likelihood of abuse or neglect). No concerns appear in the record suggesting she was ever high or intoxicated in the children's presence, while she was caring for them, or at any point when she was in contact with workers on the case. We emphasize the

importance of Mom continuing to be honest regarding her use and working with her counselor to address what triggers her use. However, on our de novo review, we conclude substance abuse does not support termination of Mom's parental rights.

3. *Domestic violence.* From the start of this case, Mom has consistently and substantively engaged in mental health counseling services to address her relationship and domestic violence concerns. In an accountability letter Mom completed with her therapist in July 2019, she acknowledged her relationship with Akoya was not healthy and vowed to only interact with him through third parties and only as necessary when related to their child. She has maintained that vow.

Mom was arrested for a domestic altercation with Dad in December 2019. It is clear the State supported termination based primarily on its belief that Mom and Dad were engaged in a clandestine relationship. The CASA's support for termination also centered on Mom's relationship with Dad.

The CASA and the juvenile court characterize the December 2019 incident between Mom and Dad as a return to the type of toxic relationship Mom had with Akoya. However, we do not view the December fight, or Mom's relationship with Dad, to be similar to the one she had with Akoya. We agree with the GAL that viewing the relationships this way erases the progress Mom has made.

At the start of this case, Mom was volatile. She sought out conflict with Akoya's girlfriends, resulting in entry of a no-contact order and multiple jail stays. It appears Akoya was abusive and likely played more of a role in those conflicts than is immediately obvious from the record. However, Mom ultimately took responsibility for her choices. Following her April 2019 violation of the no-contact order, no further incidents

involving Akoya or his girlfriends occurred. We credit Mom's ability to enforce her separation from Akoya.

Further, Mom engaged in therapy directly addressing domestic violence and bad patterns in relationships. According to her therapist, she engaged actively and made good progress on understanding what caused the issues that led to DHS's involvement in this case. The CASA report also indicated she understood that DHS's remaining concern in February 2020 involved her romantic relationships and that she had ended her relationship with Dad to address that concern.

The incident that led to Mom's December arrest resulted from her decision to break up with Dad specifically because it would be better for the children. She asked Dad to leave, and his response caused the fight that led to both their arrests. Even the juvenile court's recitation of this incident puts the blame primarily on Dad, noting he became upset when Mom dropped the Xbox, breaking it, and he subsequently pushed her to the ground and put her into a headlock. We note the criminal charges against Mom were dismissed, while Dad pleaded guilty to a lesser charge.

This is not the same type of conduct that led to Mom's troubling behavior at the start of the case. There is a difference between seeking out conflict, even if provoked, which comprised much of Mom's relationship with Akoya and his girlfriends, and defending oneself. We acknowledge this is a problematic incident. However, it does not mean Mom has made no progress or, more importantly, that the children cannot be returned to her. The CASA report and Mom's success at removing Akoya from her life demonstrate she has the insight necessary to address this problem.

While Mom has had some contact with Dad, the State has failed to present clear and convincing evidence that she is in the harmful and clandestine relationship suggested by DHS. DHS presented only three

snippets of evidence: a Facebook picture from New Years' Eve 2019, Dad's presence in the parking lot of Mom's apartment two days after she gave birth to his daughter, and an uncorroborated comment by A.B. during a videoconference visit—when he was not physically present with Mom—that Dad had cooked spaghetti for supper. This evidence presents only implications that do not amount to clear and convincing evidence that Mom continued in an inappropriate relationship with Dad. Thus, the conclusion that Mom cannot have her children in her custody because of a continued relationship with Dad does not withstand scrutiny.

Importantly, Mom's parenting has never seriously been questioned, apart from the initial founded report of abuse. She accepted responsibility for putting A.C.1 in danger when she left her in the car, and she has worked on addressing the issues that led to that decision. Mom has taken advantage of available opportunities to better her parenting skills, including resources she proactively sought out. Throughout this case, Mom has been consistent in her commitment to her children. There is no serious contention that the children would be unsafe in her custody, so long as she avoids negative relationships.

A final note on Mom's argument that DHS failed to provide reasonable efforts toward reunification. The challenge for lack of efforts started in July 2019, and Mom moved for a hearing to require such efforts in November 2019 on the basis of a lack of visits and failure to move forward with less restricted visits given her progress. The motion was not heard until February 2020 for A.B., June for A.C.1 and A.C.2, and no decision was reached until September, nearly a year after the first motion. Our disposition leaves the CINA action in place, and we trust DHS will make reasonable efforts moving forward, as appropriate.

We conclude the juvenile court erred in finding the children could not be returned to Mom's custody—the required fourth element for a termination under section 232.116(1)(*f*) and subsection (*h*). We therefore reverse the termination of Mom's parental rights as to A.B., A.C.1, and A.C.2.

**B. Termination of Dad's Parental Rights.** We next consider whether the juvenile court erred by terminating Dad's parental rights to A.C.1. In this analysis, we consider the three-part test from Iowa Code section 232.116, including whether any grounds for termination were proven, the best interests of the child, and whether any exceptions to save the parent–child relationship apply. *In re M.W.*, 876 N.W.2d at 219–20.

1. *Grounds for termination under section 232.116(1).* Dad's parental rights to A.C.1 were terminated on the same grounds as Mom's: that A.C.1 could not be placed in his custody at the time of the hearing. Dad participated in this case sporadically. When the new caseworker started, she noted she would have concerns if Dad was expected to be a primary caretaker to the children due to his ambivalence. He did not take advantage of those services available to him and did not take full advantage of visitation with A.C.1.

Dad's drug test results and substance abuse evaluation indicate he likely has a substance abuse problem, and he did not meaningfully address that problem during the pendency of this case. Dad initially blamed a lack of insurance for his failure to participate in substance abuse services. When he eventually did undergo an evaluation, he did not provide its results to the department or the court until the termination hearing. This report apparently concluded he was at high risk of substance abuse, but Dad still denied having a substance abuse problem. Finally, Dad reported he started therapy toward the end of this case, but

he failed to provide any evidence to support the identity of a therapist or the types of services provided.

Although Dad cooperated in this case on a basic level, he failed to fully engage with DHS recommendations and address the problems DHS identified. His lack of efforts stands in stark contrast to Mom, who attempted to comply with all court-ordered services. Moreover, it does not appear he would be able to provide stable housing for A.C.1. On our de novo review of the record, we conclude A.C.1 could not be returned to Dad's custody at the time of adjudication and the State has proved the grounds for termination.

2. *The best interests of the child under section 232.116(2).* Once we conclude DHS has proven a ground for termination of parental rights, we next ask "whether the termination of parental rights would be in the best interest of the child under section 232.116(2)." *In re M.W.*, 876 N.W.2d at 224.

> When we consider whether parental rights should be terminated, we "shall give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." . . . For integration, we look at how long the children have been living with the foster family, how continuity would affect the children, and the preference of the children if they are capable of expressing a preference.

*Id.* (quoting Iowa Code § 232.116(2)). Additionally, in evaluating the child's best interest we note

> [i]t is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child.

*Id.* (alteration in original) (quoting *In re A.M.*, 843 N.W.2d 100, 112 (Iowa 2014)).

Dad made minimal efforts during the year and a half he was involved in the CINA case, and he fails to identify how additional time will change the fact that A.C.1 cannot be placed in his custody. He lacked stable housing throughout, and he continues to deny a substance abuse problem despite the recent assessment identifying him at high risk for substance abuse. The juvenile court properly found that the A.C.1's best interests support terminating Dad's parental rights.

3. *Exceptions in section 232.116(3).* Finally, we must "determine whether any exceptions in section 232.116(3) apply to preclude the termination." *Id.* at 225. Of the statutory exceptions, subsection (*c*) is the only potentially relevant subsection. It allows a court to deny termination if "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." Iowa Code § 232.116(3)(*c*).

Although Dad has participated in this case and formed some bond with A.C.1, it is not clear terminating his parental rights to her would be more detrimental to her than giving her permanency. The record reveals the new caseworker expressed concern over Dad's ambivalence toward the children, including A.C.1. Moreover, A.C.1 is quite young, indicating she has had less time to form a bond that may be affected by termination. We conclude there is not clear and convincing evidence termination would be detrimental to A.C.1 due to the closeness of her relationship with Dad.

**V. Conclusion.**

We reverse the juvenile court's termination of Mom's parental rights to A.B., A.C.1, and A.C.2. We grant Dad's application for delayed appeal and affirm the juvenile court's termination of Dad's parental rights as to A.C.1. We remand for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Christensen, C.J., and Appel, Waterman, and Mansfield, JJ., join this opinion. McDermott, J., files an opinion concurring in part and dissenting in part in which McDonald, J., joins.

**McDERMOTT, Justice (concurring in part and dissenting in part).**

The majority today loosens lug nuts on the wheels of justice. By permitting ad hoc exceptions to our unambiguous appeal deadlines, the court veers from rules that have long provided clarity and predictability for courts and court participants alike. The father admits he failed to file his petition on appeal within the deadline. His appeal should be dismissed.

Iowa Rule of Appellate Procedure 6.101(1) specifies the deadline to file a notice of appeal in termination-of-parental-rights cases. It states:

> A notice of appeal from a final order or judgment entered in Iowa Code chapter 232 termination-of-parental-rights or child-in-need-of-assistance proceedings must be filed within 15 days after the filing of the order or judgment.

Iowa R. App. P. 6.101(1)(*a*).

After appellants file a notice of appeal, they next must file a "petition on appeal," which is "a streamlined, fill-in-the-blanks form, designed to be completed in an expeditious manner." *In re L.M.*, 654 N.W.2d 502, 506 (Iowa 2002). The petition on appeal form includes, among other things, a statement of material facts and legal issues presented for appeal. *See* Iowa R. App. P. 6.201(1)(*d*), 6.1401 — Form 5. Rule 6.201(1) specifies the deadline to file a petition on appeal in termination-of-parental-rights cases:

> A petition on appeal must be filed with the clerk of the supreme court within 15 days after the filing of the notice of appeal with the clerk of the district court or within 15 days after the filing of an order granting an interlocutory appeal. The time for filing a petition on appeal shall not be extended.

Iowa R. App. P. 6.201(1)(*b*). If the phrase "must be filed" within fifteen days wasn't clear enough, the rule adds a sentence that erases any doubt about a party's ability to file an untimely petition on appeal: "The time for

filing a petition on appeal shall not be extended." *Id.* This language delivers not some aspirational suggestion but an unequivocal command. This is the deadline the father missed; on this point there is no dispute.

Rule 6.201(3) is singularly devoted to what happens if the petition on appeal is not filed on time:

> *Consequence of failure to file a timely petition on appeal.* If the petition on appeal is not filed with the clerk of the supreme court within 15 days after the filing of a notice of appeal or within 15 days after the filing of an order granting an interlocutory appeal, the supreme court shall dismiss the appeal, and the clerk shall immediately issue procedendo.

One would be hard pressed to find any ambiguity or verbal vagueness in these rules or deadlines—or the consequences in failing to comply with them. The majority, for its part, doesn't attempt to justify its holding permitting the father's late-filed petition on appeal in this case based on some lack of clarity or interpretative disagreement in how to construe these rules.

Instead, the majority relies on a concern that enforcing our clear rules might violate a party's due process rights. Termination-of-parental-rights cases unquestionably implicate due process rights based on the parent's protected liberty or property interest in the care, custody, and control of a child. *Troxel v. Granville*, 530 U.S. 57, 65–66, 120 S. Ct. 2054, 2060 (2000); *In re C.M.*, 652 N.W.2d 204, 212–13 (Iowa 2002). But in response to due process challenges to these rules, we've long held that these deadlines do not violate parents' due process rights. *In re C.M.*, 652 N.W.2d at 212–13. "The State has a compelling interest in finalizing permanent placements for children as soon as possible," and we've held that the fifteen-day deadline for filing a notice of appeal "is narrowly tailored to accomplish that objective." *In re L.M.*, 654 N.W.2d at 505–06

(finding no constitutional infirmity in the deadlines in response to an equal protection challenge).

Appeal deadlines are "mandatory and jurisdictional." *Root v. Toney*, 841 N.W.2d 83, 87 (Iowa 2013); *see also Lundberg v. Lundberg*, 169 N.W.2d 815, 817 (Iowa 1969), *overruled in art on other grounds by Sykes v. Iowa Power & Light Co.*, 263 N.W.2d 551, 553 (Iowa 1978). That means that we, as an appellate court, *do not have jurisdiction to hear the case* when parties miss their filing deadlines. "Where an appellant is late in filing, by as little as one day, we are without jurisdiction to consider the appeal." *In re Marriage of Mantz*, 266 N.W.2d 758, 759 (Iowa 1978). Due process itself makes jurisdictional requirements mandatory. "Due process protects the defendant's right not to be coerced except by lawful judicial power." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 877, 131 S. Ct. 2780, 2785 (2011). Procedural rules "serve a definite purpose and are more than technical; they have substance, in that they lay down definite rules which are essential in court proceedings so that those involved may know what may and may not be done and confusion, even chaos, may be avoided." *MC Holdings, L.L.C. v. Davis Cnty. Bd. of Rev.*, 830 N.W.2d 325, 332 (Iowa 2013) (Waterman, J., dissenting) (quoting *BHC Co. v. Bd. of Rev.*, 351 N.W.2d 523, 526 (Iowa 1984)).

The majority notes that defendants in criminal cases have a constitutional right to effective assistance of counsel and that parents in termination-of-parental-rights cases also have a right to effective assistance of legal counsel. Drawing on this similarity, the majority invites us to consider that accused defendants have a remedy to pursue ineffective-assistance-of-counsel claims for late-filed appeals in criminal cases (through state postconviction relief actions or federal actions under 28 U.S.C. § 2255), while parents have no similar avenues to remedy

ineffective assistance for late-filed appeals in termination cases. The majority suggests permitting delayed appeals in some termination-of-parental-rights cases might address this disparity.

But the solution to a claim of ineffective assistance in a termination case can't be to pretend our jurisdictional rules aren't mandatory and suspend their enforcement extemporaneously. Again, a blown jurisdictional deadline in a termination-of-parental-rights case *prevents our court from proceeding* with the appeal. The rule tolerates no exceptions for cases in which a party alleges ineffective assistance of counsel. *See* Iowa R. App. P. 6.201(3) ("If the petition on appeal is not filed with the clerk of the supreme court within 15 days . . . the supreme court shall dismiss the appeal, and the clerk shall immediately issue procedendo."). The clear instruction that the court "shall dismiss" should not be reinterpreted to mean "shall *not* dismiss if the delay is negligible and the client can blame the lawyer."

And even if relaxed enforcement of these jurisdictional deadlines offered a defensible prescription, it's weak medicine with nasty side effects. The majority touts looking past blown deadlines as a fix for ineffective assistance, but only if the period of delay is "no more than negligible." So more egregious ineffective assistance (where the lateness isn't what a future court deems "no more than negligible") still has no remedy, but less egregious ineffective assistance (where the deadlines are missed by a lesser duration) will earn a pass? The more ineffective the counsel, the less protection the majority's remedy offers. And in this case, the majority doesn't even require ineffective assistance, only that "the failure to timely perfect the appeal was outside of the parent's control." Whatever the appropriate antidote might be to address the problem of ineffective

assistance in termination-of-parental-rights cases, this is not it. The side effects of the majority's tonic will far outstrip its curative potency.

Dismissing an appeal because of a missed deadline can seem like a harsh consequence. But like statutes of limitations, appeal deadlines "necessarily operate harshly and arbitrarily with respect to individuals who fall just on the other side of them." *United States v. Locke*, 471 U.S. 84, 101, 105 S. Ct. 1785, 1796 (1985). No one disputes that procedural rules "are a necessary part of an orderly system of justice." *Houston v. Lack*, 487 U.S. 266, 283, 108 S. Ct. 2379, 2389 (1988) (Scalia, J., dissenting) (quoting *Thompson v. Immigr. & Naturalization Serv.*, 375 U.S. 384, 390, 84 S. Ct. 397, 400 (1964) (Clark, J., dissenting), *overruled by Bowles v. Russell*, 551 U.S. 205, 214, 127 S. Ct. 2360, 2366 (2007)). Yet their efficacy "depends upon the willingness of the courts to enforce them according to their terms." *Id.* Like a reservation that's taken but not held, a deadline that's promulgated but not enforced neglects the most important part: the *enforcing.*

In 2001, the legislature authorized the court to provide shorter appeal deadlines "to expedite the resolution of appeals" in termination-of-parental-rights cases. 2001 Iowa Acts ch. 117, § 1, (codified at Iowa Code § 232.133(2) (2003)). Almost immediately, we established the expedited fifteen-day deadlines in our appellate rules. In the nearly two decades since, we have demanded that parties comply with these deadlines. *See, e.g., In re J.H.*, 952 N.W.2d 157, 165 (Iowa 2020) (dismissing terminated mother's appeal "because it was untimely"). If we now believe that fifteen days is insufficient time for parties to comply, we should make changes through our customary and longstanding rule amendment process, not by announcing ad hoc exceptions in our judicial opinions. "Such dispensations in the long run actually produce mischievous results,

undermining the certainty of the rules and causing confusion among the lower courts and the bar." *Houston*, 487 U.S. at 283, 108 S. Ct. at 2389 (1988). As Judge Easterbrook put the point: "If the rules are good, enforce them; if the rules are bad[,] change them; there's little point in having good rules but winking at noncompliance." *Diamonds.net LLC v. Idex Online, Ltd.*, 254 F.R.D. 475, 477 n.2 (S.D.N.Y. 2008) (quoting Howard J. Bashman, *20 Questions for Circuit Judge Frank H. Easterbrook*, Above the Law: How Appealing (Aug. 2, 2004), https://howappealing.abovethe law.com/20q/2004_08_01_20q-appellateblog_archive/ [https:// perma.cc/U4YG-DKSB].

The court can't simply recite that we permitted delayed appeals in criminal cases and start cutting down the nets. The legislature's rationale in authorizing expedited appeals in termination-of-parental-rights cases— a rationale embraced in our appellate rules' fifteen-day deadlines—also provides a basis for distinguishing the criminal cases that the majority relies on in loosening enforcement of the deadlines. From a procedural standpoint, in criminal cases the interests of the criminal defendant are principally before the court. By contrast, in termination-of-parental-rights cases, the interests of *the child* are principally at issue. Iowa Code § 232.116(2) (2020) (stating that in considering whether to terminate parental rights "the court shall give primary consideration to *the child's* safety, to the best placement for furthering the long-term nurturing and growth of *the child*, and to the physical, mental, and emotional condition and needs of *the child*" (emphasis added)); *see also In re M.W.*, 876 N.W.2d 212, 224 (Iowa 2016). The expedited deadlines promote the child's best interests by achieving permanency in a more timely fashion and "reducing the time all must wait in litigation limbo until their case is finally resolved." *In re R.K.*, 649 N.W.2d 18, 21 (Iowa Ct. App. 2002) (en banc) (per curiam).

Termination proceedings impact children, parents, foster families, guardians, and other caretakers involved in pursuing secure final placements for the children. In delayed termination-of-parental-rights cases, the number of people prejudiced, and the nature and severity of that prejudice, will almost always exceed that of the criminal cases the majority relies on. The importance of expeditious finality exists for all court matters, but perhaps in no case—as the legislature implicitly recognized in section 232.116(2) in authorizing expedited appeals—more so than termination-of-parental-rights matters.

The majority acknowledges "the countervailing interests involved" in deciding whether to relax the deadlines and specifically the "interest in finality" to move forward with a permanency plan. The majority then cautions (as mentioned above) that "an untimely appeal should be allowed to proceed only if the resulting delay is no more than negligible." This nods to the importance of the deadlines while simultaneously eviscerating them. Weighing the "countervailing" interests of the child in finality often will be intertwined with a merits inquiry. On this point too, today's ruling introduces complexity where before there was none.

Considering the long-established jurisdictional grounds requiring us to dismiss late-filed appeals, we need not go into detail about the many practical problems that today's holding will spawn in future cases. An entire body of case law will need to develop around if and when "a valid due process argument might be advanced" by the parent if the appeal is dismissed, how long of a delay is "negligible" enough (Two days? Two weeks? Two months?) to satisfy the majority's tastes, and what reasons for missed deadlines "outside of the parent's control" will clear the bar. Of course, enforcing unambiguous deadlines permits courts and parties to

avoid such ad hoc determinations in the first place. Today's ruling undermines our own objectives.

Appeal deadlines aren't qualified or aspirational; they're "absolute." *United States v. Kwai Fun Wong*, 575 U.S. 402, 423, 135 S. Ct. 1625, 1640, (2015) (Alito, J., dissenting). The deadline in Rule 6.201(1)(*b*) that the father missed in this case imposes a limit on the courts' jurisdiction that we should not take upon ourselves to extend. I concur in the majority's opinion reversing the juvenile court's termination of the mother's parental rights to A.B., A.C.1, and A.C.2. But I respectfully dissent from the majority's grant of the father's untimely appeal and would dismiss his appeal for lack of jurisdiction.

McDonald, J., joins this concurrence in part and dissent in part.